

FILED
AUG 0 4 2010
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| CONSTITUTION PARTY OF SOUTH DAKOTA, JOY HOWE, MARVIN MEYER, and MARK PICKENS, | * * * * | CIV 10-3011-RAL |
| Plaintiffs, | * * | ORDER GRANTING DEFENDANT'S MOTION FOR |
| vs. | * * | SUMMARY JUDGMENT AND DENYING PLAINTIFFS' |
| CHRIS NELSON, in his official capacity as Secretary of State of South Dakota, | * * | MOTION FOR PRELIMINARY INJUNCTIVE RELIEF |
| Defendant. | * * | |

## I. INTRODUCTION

On June 11, 2010, Plaintiffs Constitution Party of South Dakota, Joy Howe, Marvin Meyer, and Mark Pickens, filed a complaint against Defendant Chris Nelson, South Dakota Secretary of State, alleging First and Fourteenth Amendment and Equal Protection Clause claims. Plaintiffs' claims relate to efforts to get a Constitution Party candidate for South Dakota Governor on the 2010 ballot and the statutory restriction prohibiting petition-circulating by out-of-state residents. (Doc. 1). With their complaint, Plaintiffs filed a Motion for Preliminary Injunction (Doc. 5), requesting that expedited oral argument be held and requesting that this Court compel Defendant to list a Constitution Party gubernatorial candidate on the 2010 ballot. This Court held a hearing on June 16, 2010, during which the parties sought a hearing for mid-July.

On June 30, 2010, Defendant filed a Motion to Dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a Motion for Judgment on the Pleadings under Rule 12(c), and alternatively, for

Summary Judgment under Rule 56 (Doc. 20), along with a Statement of Material Facts (Doc. 23). This Court held a second hearing July 15, 2010. For the reasons explained below, this Court grants the Defendant's Motion for Summary Judgment and denies the relief sought by the Plaintiffs.

## II. FACTS

The Constitution Party of South Dakota initially formed on March 1, 2004, when it filed a written declaration signed by at least 2.5% of the voters of the State under South Dakota Codified Laws § ("SDCL") 12-5-1. The Constitution Party in 2006 obtained the requisite number of signatures on a nominating petition to have its candidate for Governor, Steven Willis, listed on the 2006 ballot. However, Mr. Willis received less than 2.5% of the vote, resulting in the Constitution Party losing its status as a "political party" under SDCL 12-1-3(10).

Under SDCL 12-5-1, the Constitution Party once again filed to become a new party on March 19, 2008. South Dakota law requires candidates of new political parties who wish to be listed on the gubernatorial ballot to file a petition containing 250 signatures of voters registered to vote as members of the new political party. SDCL 12-5-1.4(1). This requirement differs from that imposed on gubernatorial candidates from established political parties, who must obtain signatures equal to 1% of their party membership to be listed on a ballot. SDCL 12-6-7. The Constitution Party presently has 315 registered members in South Dakota. As a consequence of its limited number of members, the 250-signature requirement for a gubernatorial candidate of the Constitution Party is equivalent to 79.4% of the party membership.

2

South Dakota law requires that in order for a gubernatorial candidate from a new political party to be placed on the ballot for the general election, the individual must use the petition process. SDCL 12-5-1.4(1). A petition requirement exists for gubernatorial candidates for all parties. See generally SDCL 12-6-1. South Dakota law permits party candidates for positions other than Governor and legislators to be nominated and placed on the ballot through a state convention.

South Dakota law does not permit an out-of-state resident to circulate petitions. Under SDCL 12-1-3(9), a "petition circulator" is a resident of the State of South Dakota who is at least eighteen years of age.

The deadline for filing with the Secretary of State a nominating petition for gubernatorial candidates was March 30, 2010. SDCL 12-6-4. On August 12, 2010, the Secretary of State will begin to certify the general ballot, containing the names of those legally nominated, to the county auditors, and must complete certification by August 17, 2010. SDCL 12-8-8.

No Constitution Party candidate filed a nominating petition for the office of South Dakota Governor by the deadline or at any time since the deadline of March 30, 2010. Peter Boeve, a member of the Constitution Party, circulated a petition to run for South Dakota Governor, failed to obtain the requisite 250 signatures by the March deadline, and did not file a nominating petition. Boeve declared that his efforts to obtain the 250 signatures were "extremely diligent," but that due to the "vast dispersal of the Constitution Party members," he was unable to satisfy the 250-signature requirement. Declaration of Peter Boeve, Doc. 8. Despite having the assistance of another Constitution Party member, Joy Howe, Boeve was able to collect only 85 signatures. Affidavit of Peter Boeve, Doc. 31. Plaintiff Mark Pickens,

3

a resident of Arizona, was unable to sell or volunteer his services as a petition circulator to Boeve, because he was not a South Dakota resident. See SDCL 12-1-3(9).

Although South Dakota law does not allow a party to select a gubernatorial candidate by nomination at a convention, Plaintiff Joy Howe, another member of the Constitution Party, received the nomination of the South Dakota Constitution Party as its gubernatorial candidate at its June 19, 2010 convention. Plaintiff Marvin Meyer, another member of the Constitution Party, intends to vote for Howe for Governor if she is placed on the general ballot. Declaration of Marvin Meyer, Doc. 9. Meyer would have supported Boeve if he had not deserted his bid for Governor. Id. The Constitution Party also nominated a candidate for South Dakota Secretary of State whom Defendant will certify to be on the 2010 ballot.

Plaintiffs Constitution Party, Howe, Meyer, and Pickens have sued Defendant South Dakota Secretary of State Chris Nelson, claiming that SDCL 12-5-1.4 violates the First and Fourteenth Amendments by requiring gubernatorial candidates of new political parties to obtain 250 signatures of voters registered to vote as members of the new political party by a March deadline via a petition process. Plaintiffs also sued Defendant to challenge as unconstitutional SDCL 12-1-3(9), which disqualifies non-residents of South Dakota from circulating petitions for ballot access. The complaint seeks (1) declaratory judgment that the 250-signature requirement and ballot access laws are unconstitutional; (2) permanent injunctive relief to stop the State from implementing and enforcing the ballot access scheme; and (3) injunctive relief to place Howe on the general election ballot as the Constitution Party candidate for Governor. Plaintiffs also seek an award of attorney fees and costs associated with this action, and any other equitable relief deemed proper by this Court. At the July 15, 2010 motions hearing, this Court denied Plaintiffs' request for an order requiring Defendant

4

to place Howe on the general election ballot. Ruling was deferred on the other requests for relief, as well as Defendant's motions for dismissal and summary judgment, until completion of briefing of those issues.

## III. DISCUSSION

### A. Summary Judgment and Preliminary Injunction Standards

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 518 (8th Cir. 2010) (citing Johnson v. Ready Mixed Concrete, Co., 424 F.3d 806, 810 (8th Cir. 2005)); see Fed. R. Civ. P. 56(c). "The nonmoving party is entitled to all reasonable inferences that may be drawn from the evidence, but not to inferences that may only be drawn by resorting to speculation." Culton v. Mo. Dep't. of Corr., 515 F.3d 828, 830 (8th Cir. 2008) (quoting Williams v. City of Carl Junction, Mo., 480 F.3d 871, 873 (8th Cir. 2007)). The nonmoving party "must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." Williams, 480 F.3d at 873 (quoting FDIC v. Bell, 106 F.3d 258, 263 (8th Cir. 1997)).

The determination of whether a court should issue a preliminary injunction involves consideration of "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties []; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981).

This Court grants the motion for summary judgment, and consequently denies the motion for preliminary injunction because Plaintiffs have failed to show any likelihood of success on the merits.

**B. Lack of Standing**

Before addressing the merits of the Plaintiffs' complaint, this Court must determine

whether any of the Plaintiffs have standing. For a dispute to be resolved through the judicial

process, or under the Article III judicial powers, the Plaintiffs must have standing. See Lujan

v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To have standing, a plaintiff invoking

the judicial process must establish the following: (1) plaintiff has suffered an "injury in fact"

that is "concrete and particularized" as well as "actual or imminent" rather than "conjectural

or hypothetical," (2) "a causal connection between the injury and the conduct complained of"

exists, and (3) it is "likely," not merely "speculative," that the injury will be redressed by a

favorable decision. Id. at 560-61 (internal citations omitted).

Each element of standing must be supported with the same degree of evidence as any

other matter on which a plaintiff bears the burden of proof at the particular stage of litigation.

Id. at 561 (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883-89 (1990)). A motion to

dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c) are

made at the pleading stage, and thus general factual allegations of injury resulting from the

defendant's conduct may suffice. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 889. However, a

plaintiff cannot rely on "mere allegations" to survive a motion for summary judgment, and

instead must provide evidence of specific facts through an affidavit or other evidence that, for

purposes of Rule 56, will be taken as true. Lujan v. Defenders of Wildlife, 504 U.S. at 561.

Because Defendant's Motion for Summary Judgment presents the standing issue, the

Plaintiffs must put forward by affidavit or otherwise "specific facts." This Court will take the

facts set forth by Plaintiffs as true for purposes of the standing determination. Id. When

evaluating whether the three parts of standing exist, this Court must look at the facts "as they

6

exist at the time the complaint is filed." Id. at 569 n.4 (quoting Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989)).

### 1. Plaintiff Joy Howe

Plaintiff Joy Howe, who at the time the complaint was filed was seeking—and now has obtained—the nomination at the state convention to be the Constitution Party's gubernatorial candidate, argues that she has been injured by the State's ballot access restrictions because she is unable to be on the ballot or to vote for the candidate of her choice. To be on the ballot for the South Dakota gubernatorial election, the candidate from a new party must file a petition bearing signatures of at least 250 registered voters in that party. SDCL 12-5-1.4. Howe not only failed to meet the 250-signature requirement, but also failed to even attempt to comply with the requirement.[1] Howe also failed to file a petition with the Secretary of State as an independent candidate under SDCL 12-7-1.

Defendant argues that Howe lacks standing because she did not attempt to follow the requisite procedure to have her name placed on the general election ballot. "[I]f a plaintiff is required to meet a precondition or follow a certain procedure to engage in an activity or enjoy a benefit and fails to attempt to do so, that plaintiff lacks standing to sue because he or she should have at least taken steps to attempt to satisfy the precondition." Pucket v. Hot Springs School District, 526 F.3d 1151, 1161 (8th Cir. 2008) (citing T.L.J. v. Webster, 792 F.2d 734, 739 n.5, 740 (8th Cir. 1986)).

---

[1] Although Boeve attempted to comply with the signature requirement, he did not file a petition. Boeve was the only member of the Constitution Party who attempted to gather the 250 signatures necessary to file a petition to run for Governor with the Secretary of State, but is not a plaintiff in this law suit.

In Pucket, plaintiffs sued the public school district for failing to resume busing of private school children on the public school buses after a state law became effective that would allow such busing. 526 F.3d at 1156. The United States Court of Appeals for the Eighth Circuit held that the plaintiffs lacked standing to challenge the School District's failure to resume busing the students. Id. at 1163. The Eighth Circuit reasoned that the plaintiffs lack standing when there is a procedure in place to obtain a benefit and the plaintiffs fail to attempt to follow the procedure. Id. Finding that the plaintiffs had not actually requested the School District to resume busing the students, the Eighth Circuit determined that they had failed to even take steps to attempt to follow the procedure necessary to have busing reinstated, and therefore lacked standing. Id. Likewise in T.L.J. v. Webster, the Eighth Circuit held that the plaintiff lacked standing to challenge the process for obtaining a judicial bypass necessary to get an abortion without parental consent when the plaintiff had never attempted to obtain the bypass. 792 F.2d at 740.

The United States Court of Appeals for the Eleventh Circuit has found that when a candidate did not achieve access to a ballot because he failed to meet the state signature requirement, an injury "fairly traceable" to the signature requirement exists. See Swanson v. Worley, 490 F.3d 894, 903 n.10 (11th Cir. 2007). In Swanson, the Eleventh Circuit found that the injury—omission from the ballot—was due to failure to meet this requirement, and thus the injury was "fairly traceable" to the signature requirement. Id. Unlike Howe, the plaintiff in Swanson had made an attempt to gain the requisite number of signatures. Id. at 897.

Howe lacks standing because she did not suffer an injury given that the State did not preclude her from doing anything. A plaintiff lacks standing when the specific plaintiff has

8

not been precluded from doing something by a statute or by state enforcement of the statute. Warth v. Seldin, 422 U.S. 490, 516 (1975). For example, in Warth, the Supreme Court found that when the plaintiff never applied for a building permit or zoning variance, he had not been precluded from building by the statute or discriminatory zoning ordinance. Id. Howe did not submit a petition with any signatures for certification, thus the Secretary of State never denied such a petition by Howe.

Howe alternatively asserts the existence of standing because it would have been futile for her to obtain 250 signatures of Constitution Party members. The Eighth Circuit has found that "a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile." Pucket, 526 F.3d at 1162. When a plaintiff has some characteristic that, by statutory definition, results in her application being automatically denied, her application is considered futile. See Sporhase v. Neb., ex rel. Douglas, 458 U.S. 941, 944 n.2 (1982); S.D. Mining Ass'n v. Lawrence County, 155 F.3d 1005, 1008-09 (8th Cir. 1998). In Sporhase, a reciprocity requirement of state law made it inevitable that the plaintiff's application would have been denied. Therefore, despite the plaintiff's failure to apply, plaintiff nevertheless had standing to challenge the legality of the reciprocity requirement. Sporhase, 458 U.S. at 944 n.2. Similarly in S.D. Mining Ass'n, the application would have been futile when all plaintiffs owned land that by statutory definition barred them from a new or amended permit for surface metal mining. In such circumstances, a live controversy existed, despite a failure to apply. S.D. Mining Ass'n, 155 F.3d at 1008-09.

Here, however, the requirement to obtain 250 signatures of new party members was a prerequisite capable of being met by Howe, unlike the situations the plaintiffs faced in Sporhase and S.D. Mining Ass'n. The attempt to obtain the signatures and then file a petition

with the Secretary of State would not necessarily be futile. The signatures of 250 members of the Constitution Party of South Dakota, though roughly 79% of its total membership, would be enough to file a petition for candidate access to the ballot. Albeit with strong support for a candidate, the 250 signatures could have been obtained. See Storer v. Brown, 415 U.S. 724, 740-41 (1974) (gathering 325,000 signatures in 24 days "would not appear to be an impossible burden"). Indeed, the Constitution Party candidate for South Dakota Governor met this standard in 2006 and was listed on the ballot.

Plaintiffs argue that each have standing because their "voting rights are diminished by the reduction of choice on the ballot." (Doc. 25, p. 8). However, a voter is not necessarily entitled to have his or her candidate of choice on the ballot. The Supreme Court has upheld state requirements that candidates file a nominating petition signed by a certain percent of eligible voters in order to have their names placed on the general election ballot. See Am. Party of Tex. v. White, 415 U.S. 767, 782-83 (1974); Jenness v. Fortson, 403 U.S. 426, 442 (1971). Although such a regulation prevents a general election ballot from listing every single individual who wishes to run for office, it does not abridge the fundamental right to vote. Thus, Plaintiff Howe lacks standing to assert the claims alleged in the Complaint.

**2. Plaintiff Marvin Meyer**

Plaintiff Marvin Meyer is a member of the Constitution Party of South Dakota who wants to vote for a Constitution Party gubernatorial candidate. Plaintiff Meyer has not suffered an injury and therefore lacks standing.

First, a plaintiff does not have standing when he cannot demonstrate specific injuries. Lujan v. Defenders of Wildlife, 504 U.S. at 560. Meyer has not suffered specific injuries merely by an inability to vote for Boeve or Howe. See Robinson v. Bowen, 567 F. Supp. 2d

1144, 1146 (N.D. Cal. 2008) (where plaintiff is not a candidate, the harm alleged is speculative and derivative of the candidate's injuries, and is neither particularized, actual, or imminent). Therefore, the alleged injury faced by Meyer does not give rise to standing.

Second, although "rights of voters to associate or to choose among candidates are fundamental," the state's interest in protecting the integrity and reliability of the electoral process justifies a reasonable restriction on what candidate names appear on ballots. Coal. for Sensible & Humane Solutions v. Wamser, 771 F.3d 395, 399 (8th Cir. 1985) (citing to Anderson v. Celebrezze, 460 U.S. 780, 788 & n.9 (1983)). South Dakota statutes reasonably require that those seeking nomination and ballot access show a modicum of support. See Jenness, 403 U.S. at 442 (State of Georgia has an "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot."). This case is distinct from Wamser, where individual members of an association suffered an injury-in-fact and had standing to sue when election officials refused to appoint them as voter registrars. By preventing the association members in Wamser from registering new voters, the election officials injured the members of the coalition. 771 F.2d at 399. Plaintiff Meyer has not suffered a similar injury. No one has prevented Meyer from voting or from registering new voters. His right to vote has not been infringed. There is a substantial distinction between refusing to allow an individual member to vote and requiring a new political party to show a modicum of support before having a candidate on the ballot. Although Meyer would like to support a Constitution Party candidate for Governor, he has not suffered an injury caused by state action that gives rise to standing.

In certain instances, voters enrolled in political parties have constitutional standing to challenge a state voting law, such as where ballot access laws result in voters living in certain districts either having fewer choices on the ballot than other districts or having their individual vote otherwise diluted. See Rockefeller v. Powers, 74 F.3d 1367, 1376 (2d Cir. 1995) (voters had suffered special harm particular to them when the state law decreased their voting choices relative to voters in other districts). A voter also may have standing when his injury is derivative to the candidate who is a plaintiff. See Beltiskus v. Pizzingrilli, 343 F.3d 632, 641 (3d Cir. 2003). Relying upon Bullock v. Carter, 405 U.S. 134 (1972), the Beltiskus court reasoned that injuries suffered by the voter and Green Party were derivative of the injuries of the candidate-plaintiffs who were unable to pay the mandatory filing fee and thus were unable to gain access to the ballot. Beltiskus, 343 F.3d at 641.

However, the only plaintiff who claims to be a candidate, Howe, did not suffer an injury in fact. Howe did not take steps to attempt to comply with the requisite petition process, and thus as explained above, does not have standing. Because Howe did not suffer an injury justifying standing, the voter Meyer did not suffer derivative injury to establish his standing.

Plaintiffs cite to the proposition that "laws that affect candidates always have at least some theoretical, correlative effect on voters" in so much that limiting candidate access to the primary ballot tends to limit the field of candidates from which voters might choose. See Bullock v. Carter, 405 U.S. 134, 143 (1972). The Supreme Court in Bullock recognized that the rights of voters and candidates cannot be neatly separated when determining what standard of review to properly invoke when the rights of candidates are at issue. See id. The correlative effect on voters is relevant to determining the proper standard of review to apply

12

on state action, though not necessarily when determining whether the voters have indeed suffered an injury in fact giving rise to standing. Id. Plaintiff Meyer does not have standing to make the claims contained in the Complaint.

### 3. Plaintiff Mark Pickens

Plaintiff Mark Pickens is a resident of Arizona who wishes to circulate petitions in South Dakota, presumably for the Constitution Party. Plaintiff Pickens challenges the constitutionality of SDCL 12-1-3(9) which defines a petition circulator as "a resident of the State of South Dakota who is at least eighteen years of age . . . ." SDCL 12-1-3(9). Pickens is not registered to vote in South Dakota.

Pickens has standing to make a claim challenging the constitutionality of the residency requirement for petition circulators. Even though he did not submit such a petition, it would have been futile for him to do so because a non-resident of South Dakota is prohibited by statute from being a petition circulator. Id.; see also Pucket, 526 F.3d at 1162; Sporhase, 458 U.S. at 944 n.2; S.D. Mining Ass'n, 155 F.3d at 1008-09. All parties recognize that Pickens' claim is separate and does not relate to the grounds on which Plaintiffs seek a preliminary injunction.

### 4. Plaintiff Constitution Party of South Dakota

Plaintiff Constitution Party of South Dakota maintains that it has "associational standing." An association or party may have associational standing on the basis of an injury to its members. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); Wamser, 771 F.2d at 399. Associational standing exists only if: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither

13

the claim asserted nor the relief requested requires participation of individual members. See Hunt, 432 U.S. at 343. However, when no members of a party or group has at least attempted to take steps to satisfy the prerequisite to partake in an activity or benefit, and thus lacks standing, the party also lacks standing to sue on the members' behalf. See Warth, 422 U.S. at 515-16. In Warth, members of a homebuilders' association did not apply for a building permit or variance, and did not attempt to take advantage of remedial processes. Id. at 516. "To justify relief the association must show that it has suffered harm, or that one or more of its members are injured." Id. at 515. When an association seeks prospective relief, such as declaratory or injunctive relief, it will have standing as a representative of its members only if it can show the existence of any injury to its members sufficient to allow the members to bring suit themselves. Id. at 516.

Here, none of the members of the Constitution Party, either candidates or noncandidates, have standing to challenge the petition requirement for gubernatorial candidates. No member of the Constitution Party filed a nomination petition, and therefore, no member of the Constitution Party suffered an injury to justify standing to challenge the petition requirement. Peter Boeve attempted to satisfy the 250-signature requirement, but he failed to file the nominating petition with the Secretary of State or join in the lawsuit. Therefore, the Constitution Party lacks standing.

Plaintiff Pickens does not appear to belong to Plaintiff Constitution Party of South Dakota, as he is not a South Dakota resident. Whether the Constitution Party has associational standing as to Pickens' challenge to the constitutionality of SDCL 12-1-3(9) is questionable, but academic in light of the lack of merit of that challenge.

14

With respect to the second and third elements of associational standing, the
Constitution Party seeks to protect its organization's interests and promote its goal of getting
one of its candidates elected, see Storer, 415 U.S. at 745, and the type of relief sought would
benefit its members, see Int'l Union v. Brock, 477 U.S. 274, 287-88 (1986). However,
because none of the Constitution Party's members have standing to challenge the
gubernatorial petition requirement, the Constitution Party itself does not have associational
standing to bring a claim in this Court.

## C. Constitutionality of South Dakota Statutes at Issue

Other than with respect to Plaintiff Pickens on Count II of the complaint, the
Plaintiffs lack standing to sue for alleged constitutional violations. Thus, the Court need not
reach the merits of Count I of the complaint. However, even if the Plaintiffs had standing on
Count I, Defendant still would be entitled to summary judgment on both Counts I and II of
the Complaint.

### 1. Standard of Review

The Supreme Court has recognized a candidate's constitutional rights under the First
and Fourteenth Amendments to associate for political ends and to participate equally in the
electoral process. See Burdick v. Takushi, 504 U.S. 428, 433 (1992); Anderson, 460 U.S. at
787-88. Ballot access restrictions implicate the constitutional rights of voters to associate and
cast their votes effectively. See Williams v. Rhodes, 393 U.S. 23, 30 (1968). As discussed
above, however, there is an "important state interest in requiring some preliminary showing
of a significant modicum of support before printing the name of a political organization's
candidate on the ballot" as a way of "avoiding confusion, deception, and even frustration of
the democratic process at the general election." Jenness, 403 U.S. at 442.

In Anderson, the Supreme Court directed lower courts to balance the competing interests by first considering "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments," and then evaluating "the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789. In this evaluation of the candidates' rights and the State's interest, the court must determine the strength and legitimacy of the State's interests and whether those interests make it necessary to burden the candidates' rights. Id. Weighing all of these factors, the court then must determine whether the rule is constitutional. Id.

The standard of review of the challenged statute depends on the extent of the burden imposed and the character of the right. If the state election scheme imposes "severe burdens" on constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). If, on the other hand, the scheme imposes "reasonable, nondiscriminatory restrictions" upon the plaintiff's First and Fourteenth Amendment rights, it will survive so long as the State shows an "important regulatory interest." Id. (quoting Burdick, 504 U.S. at 434).

The Eighth Circuit has held that when a statutory scheme severely limits "core political speech," it is subject to strict scrutiny and is likely unconstitutional unless the State can show that the requirement is narrowly tailored to a compelling state interest. See Meyer v. Grant, 486 U.S. 414, 421-22 (1988). Circulating a petition, for example, "involves both the expression of a desire for political change and a discussion of the merits of the proposed change," and thus constitutes "core political speech." Id. A statutory scheme that severely limits the number of people who can circulate the petition is subject to strict scrutiny. See

16

Initiative & Referendum Inst. v. Jaeger, 241 F.3d 614 (8th Cir. 2001) (a residency requirement for petition circulators triggered exacting scrutiny); Bernbeck v. Moore, 126 F.3d 1114 (8th Cir. 1997) (state statute requiring petition circulators to be registered voters was subject to exacting scrutiny).

The South Dakota law restricting petition circulators to South Dakota residents is a restriction on core political speech, and therefore, the law must be "narrowly tailored to serve a compelling state interest." Jaeger, 241 F.3d at 616. The Eighth Circuit in Jaeger, however, held that a law barring non-residents from circulating initiative petitions did not violate the plaintiff's First Amendment rights. 241 F.3d at 615.

The South Dakota law requiring 250 signatures for a new party gubernatorial candidate to achieve ballot access is not a restriction on core political speech because it does not limit the circulation of a petition or disqualify individuals from circulating a petition. Rather, it is a ballot access regulation. Therefore, rather than applying strict scrutiny by necessity, this Court must analyze the severity of the burdens on speech. If the signature requirement imposes only reasonable and nondiscriminatory restrictions, then the State's regulatory interests will likely be enough to justify the restrictions. Twin Cities Area New Party, 520 U.S. at 358.

## 2. First Amendment Challenge to Signature Requirement

Plaintiffs assert that South Dakota's 250-signature requirement violates the First and Fourteenth Amendments. The constitutionality of this requirement depends on whether the 250-signature requirement is a reasonable, non-discriminatory way of achieving the State's important regulatory interests. Timmons, 520 U.S. at 358.

17

In evaluating the reasonableness of the statute, this Court may consider "alleviating factors" provided in the statutory scheme. Swanson v. Worley, 490 F.3d 894, 903 (11th Cir. 2007); see also Storer, 415 U.S. at 740-41; Libertarian Party of Florida v. Florida, 710 F.2d 790, 794 (11th Cir. 1983). Alleviating factors that would make the statute reasonable include allowing voters to sign the petition regardless of party affiliation and allowing voters to sign more than one petition. In Libertarian Party, the Eleventh Circuit found that, in light of a 3% signature requirement, factors that eased the burden of getting signatures, and compelling state interests, the statute was valid. 710 F.2d at 794-95. Here, there are no identical alleviating factors, as all 250 petition signers must be members of the new party.

Relatedly, this Court may consider whether the state regulation diminishes the available pool of signatures. For example, in Storer, the challenged statute disqualified any voter who had voted in a partisan primary. 415 U.S. at 740-41. The South Dakota statute at issue here requires that a signatory be a registered voter of the new political party and limits a registered voter to signing only one petition. Although the Supreme Court found that disqualifying those who voted in a partisan primary from being eligible to sign the petition for the Independent Party was not itself unconstitutional, the Court stated that "it should be determined whether the available pool is so diminished in size by the disqualification . . . that the 325,000-signature requirement, to be satisfied in 24 days, is too great a burden on the independent candidates . . ." Id. at 740 (noting that gathering 325,000 signatures in 24 days "would not appear to be an impossible burden"). Here, the pool is not so diminished that the 250-signature requirement becomes unreasonable.

This Court also may consider past experience, that is, whether a minority party candidate has been successful in the past at obtaining access to the general ballot, as well as

18

the relationship between the showing of support through a petition requirement and the percentage of the votes the candidate is expected to receive in the general election. Id. at 742-43. The Constitution Party of South Dakota first became a political party in 2004, and succeeded in putting its candidate's name on the gubernatorial ballot in 2006 through the petition process. The Constitution Party gubernatorial candidate did not receive 2.5% of the gubernatorial vote, so the Constitution Party lost its status as a political party in South Dakota and had to refile to become a new political party. The Constitution Party's ability, however, to obtain access to the general ballot in 2006 suggests that the petition requirement is not excessive and sets a reasonable threshold of sufficient support to justify inclusion on the ballot.

In the analogous case of N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196 (2008), the Supreme Court of the United States considered a state law requiring an individual running for delegate to file a petition signed by 500 enrolled party members residing in the assembly district approximately two months before the delegate primary. Id. at 200. The delegate candidates had a 37-day window to obtain the 500 signatures of party members from their district. Id. The Supreme Court found the state-imposed ballot access requirement to be "far from excessive" and within the State's authority to demand a person to show a "minimum degree of support for candidate access to a primary ballot." Id. at 204.

The ballot access requirement that the Constitution Party claims to be unconstitutional is similar to the statute in Lopez Torres. The requirement to file a petition with 250 signatures of the new party members in order to gain access to the primary election ballot is half the number of the "entirely reasonable" 500-signature requirement in Lopez Torres. Id. The delegate candidates in Lopez Torres had to collect 500 signatures from enrolled party

19

members within their district, and there were 150 assembly districts in New York. Id. at 200. The burden on a delegate candidate to collect 500 signatures from party members living in one of 150 assembly districts is greater than the burden imposed on a gubernatorial candidate in South Dakota to collect 250 signatures from new party members living anywhere in South Dakota. As explained in Lopez Torres, the State's authority to require candidates to demonstrate "a significant modicum of support" before they may gain access to the ballot applies equally to primary elections. Id. at 204. The signature requirement imposed by SDCL 12-5-1.4(1) is a reasonable, non-discriminatory means of achieving the state interest in requiring a minimum degree of support before placing a candidate on the primary ballot. See Jenness, 403 U.S. at 442 (state requirement that minor party candidates file nominating petition with 5% of eligible voters' signatures upheld); White, 415 U.S. at 782-83 (state requirement that gubernatorial candidate gather signatures equaling 1% of vote from previous election upheld).

Plaintiffs argue that the 250 petition signatures required from its party members to place a gubernatorial candidate on the South Dakota ballot is unconstitutional because the Constitution Party has only approximately 315 members in South Dakota. Thus, a gubernatorial candidate for the Constitution Party has to obtain the signatures of nearly 80% of the party membership. Plaintiffs cite no cases where a court has stricken down a similar statute based on such an analysis. When viewed more broadly, the 250-signature requirement is a reasonable and non-discriminatory means of requiring gubernatorial candidates to demonstrate a significant modicum of support in order to justify ballot access. See Jenness,

20

403 U.S. at 442. The number 250 is merely .03125% of the South Dakota population,[2] .07451% of the number of voters who voted in the 2006 gubernatorial race,[3] and far fewer than the 2.5% of the voters of the State of South Dakota that the Constitution Party had to collect to organize as a party under SDCL 12-5-1.

This Court is sensitive to and mindful of the difficulties faced by minor political party candidates who, unlike candidates of major political parties, usually are not well-financed and lack access to resources available to established political parties. Nevertheless, this Court finds the 250-signature requirement to be reasonable. By mandating that a potential candidate for Governor file a nominating petition containing 250 signatures from members of the candidate's political party, the State achieves its regulatory interest in candidates attaining a sufficient modicum of support prior to being listed on the ballot. As explained above, because the signature requirement imposes only reasonable and nondiscriminatory restrictions, the State's regulatory interests are sufficient here to justify the restrictions.

### 3. Equal Protection Clause Challenge to Signature Requirement

Plaintiffs assert that imposing a different requirement on new political parties from that imposed on established political parties violates the Equal Protection Clause. However, a statute requiring that a candidate of a new political party for statewide office obtain nominating signatures, albeit different from the requirement imposed for established parties,

---

[2]The population of South Dakota is approximately 800,000. U.S. Census Bureau, Population Estimates, http://www.census.gov/popest/states/NST-ann-est.html. (last visited Aug. 3, 2010).

[3]The total number of voters in South Dakota in the gubernatorial race was 335,508. South Dakota Secretary of State Home Page, Election Official Returns for Governor & Lt. Governor, http://www.sdsos.gov/electionsvoterregistration/pastelections_electioninfo06_GEgovernorreturns.shtm (last visited Aug. 3, 2010).

does not facially violate the Equal Protection Clause. The Court must consider whether the burden on the Constitution Party is unreasonable and whether the burden was outweighed by the State's interest in, among other things, avoiding ballot clutter and ensuring viable candidates. See Jenness, 403 U.S. at 442. In Jenness, the Supreme Court found that alternate ballot access rules for major and minor political parties are not per se unconstitutional. Id. at 441-42 ("[T]here are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. . . . [R]ecognizing these differences and providing different routes to the printed ballot" does not make a state guilty of "invidious discrimination."). However, the Supreme Court in Anderson stated that "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." 460 U.S. at 793.

As discussed above, South Dakota statutes impose a reasonable burden on those seeking to run for Governor from minor political parties, justified by South Dakota's interest in preventing ballot clutter and ensuring viable candidates. A 250-signature requirement of members of a new political party to place a gubernatorial candidate on the ballot is not an unreasonable requirement. The one percent requirement for major party candidates for governor obliges those candidates to obtain several times more signatures from members of their own party than does a Constitution Party candidate. The fact that signatures from 250 party members represent such a high percentage of Constitution Party members reflects the limited size of the Constitution Party of South Dakota rather than any violation of the Equal Protection Clause. A one percent requirement applied to the Constitution Party would result in a gubernatorial candidate from the Constitution Party needing just four signatures, which

22

plainly undermines the state interest in ensuring that gubernatorial candidates listed on the ballot have a sufficient modicum of support.

### 4. Challenge to Filing Deadline

The Plaintiffs argue that the deadline for filing a nominating petition for a primary election ballot, as provided in SDCL 12-6-4, is an unconstitutional burden. The relevant South Dakota statute provides:

> [N]o candidate for any office to be filled, or nomination to be made, at the primary election, other than a presidential election, may have that person's name printed upon the official primary election ballot of that person's party, unless a petition has been filed on that person's behalf not prior to January first, and not later than the last Tuesday of March at five p.m. prior to the date of the primary election.

SDCL 12-6-4. The deadline imposed by the State applies equally to candidates from all political parties.

Plaintiffs argue that requiring signatures to be submitted in March has been found to be unconstitutional in Anderson. The Anderson case, however, involved substantially different statutes and circumstances. The Supreme Court held that the early filing deadline in Anderson was unconstitutional because it placed an unconstitutional burden on the voting and associational rights of the independent candidate's supporters. 460 U.S. 780. In Anderson, an independent candidate for President was required to file a nomination petition in March in order to gain access to the general election ballot in November. Id. at 783. The supporters of the independent candidate attempted to file the nominating petition with the Ohio Secretary of State on May 16, but the Secretary of State refused it as too late. Id. at 782-83. The State of Ohio contended that the early deadline served the State's interest in

23

voter education, ostensibly because the earlier deadline provided the voters with a longer opportunity to assess how Presidential candidates weather the scrutiny of a political campaign. Id. at 796. However, the Supreme Court found the deadline to be an unconstitutional burden on the independent party candidate and his supporters, as well as a violation of the First and Fourteenth Amendments, because the State failed to impose a comparable deadline for the candidates from other political parties. Id. at 805-06.

The South Dakota statute that imposes a March deadline for filing a nominating petition is distinguishable from the statute in Anderson. In Anderson, the March deadline was specific to independent party candidates. By contrast, SDCL 12-6-4 imposes a March deadline for filing the nominating petition for gubernatorial candidates for *all parties*. See SDCL 12-6-4. The statute in Anderson was unconstitutional because the major parties, who had "the political advantage of continued flexibility," did not have the additional burden of the March filing deadline that was considered a "correlative disadvantage" to the independents. 460 U.S. at 791. The early filing deadline in Anderson also imposed a burden on the signature-gathering efforts of independents because they were required to gather signatures well in advance of the election, before the major party candidates had necessarily been identified, thereby making it so volunteers and voters might have had less interest in the campaign. Id. at 792. The Supreme Court in Anderson noted that a "burden that falls unequally on new or small political parties or on independent candidates" will necessarily impinge on the associational choices protected by the First Amendment. Id. at 793. The South Dakota March filing deadline for gubernatorial candidate petitions does not impose a burden that falls unequally on new or small political parties. Instead, the burden falls on all political parties. Therefore, SDCL 12-6-4 does not impose a burden on the rights of the

24

Constitution Party voters and candidates any more than it burdens the rights of all other parties, voters, and candidates. SDCL 12-6-4, therefore, is not unconstitutional.

### 5. Challenge to Residency Requirement

Under SDCL 12-1-3(9), a petition circulator must be, amongst other qualifications, a resident of the State of South Dakota. The Plaintiffs argue that the State's ban on out-of-state petition circulators is an unconstitutional infringement on the First and Fourteenth Amendment rights to free speech and association. As discussed above, in determining whether a ballot-access provision is an unconstitutional infringement on free speech, a court applies a sliding standard of review; severe burdens on speech must be narrowly tailored to serve a compelling state interest, and lesser burdens need only be reasonable and non-discriminatory. See Timmons, 520 U.S. at 358. Based on prior Eighth Circuit rulings, this Court finds that the State's residency requirement for circulators of petitions is subject to strict scrutiny, but does not violate the Plaintiffs' constitutional rights.

In Jaeger, the Eighth Circuit considered a North Dakota statute similar to SDCL 12-1-3(9), in that both statutes contained a residency requirement for petition carriers. 241 F.3d at 615-16. The Eighth Circuit applied a heightened standard of review and found the residency requirement to be constitutional, reasoning that the residency requirement was necessary to achieving the compelling state interest in reducing fraud by ensuring that circulators would answer to the Secretary of State's subpoena power. Id. at 616-17. Furthermore, the Eighth Circuit found that the residency requirement did not unduly restrict speech, because it did not prevent non-residents from speaking to voters regarding political measures or accompanying the other circulators. Id. at 617.

25

Under Jaeger, the residency requirement for petition circulators in SDCL 12-1-3(9), even when subject to a heightened standard of review, is constitutional. There is no evidence that the Constitution Party was unable to hire sufficient numbers of circulators as a direct result of the residency requirement. The State did not bar Plaintiff Pickens from accompanying other circulators and speaking with potential voters about the candidate. Furthermore, the State's residency requirement serves the compelling interest of reducing fraud by confining petition circulators to those within the South Dakota Secretary of State's subpoena power, and no other less burdensome means are available for achieving this compelling state interest.

## D. Denial of Preliminary Injunction

An injunction is an "extraordinary remedy" that is not routinely granted and generally reserved for when the right to relief is "clearly established." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure, § 2942. In determining whether to issue such injunctive relief, this Court considers the factors set forth in Dataphase Sys., Inc., 640 F.2d at 113: (1) the threat of irreparable harm to plaintiffs; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on the defendants; (3) the probability of plaintiffs' success on the merits; and (4) the public interest. See also Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008); Oglala Sioux Tribe v. C&W Enter., Inc., No. 07-5024, 2009 U.S. Dist. LEXIS 25881, at *3 (D.S.D. Mar. 25, 2009) (applying Dataphase factors to TRO motion consideration). No single factor is determinative. Dataphase Sys., Inc., 640 F.2d at 113. The probability of the Plaintiffs' success is evaluated in context of the "relative injuries to the parties and the public." Id.

Because summary judgment is appropriate for the Defendant here on all claims, the Plaintiffs have no likelihood of success on the merits. The public interest favors protection of constitutional rights, but here, even if there were standing, the constitutional rights of the Plaintiffs are not violated by the South Dakota statutes at issue. The public interest favors preserving the integrity of the electoral process and "orderly election administration," and thus disfavors entry of an injunction here. See Estill v. Cool, 295 Fed.Appx. 25, 27 (6th Cir. 2008). After considering all of the Dataphase factors, the Court finds that there has not been an adequate showing to justify a preliminary injunction. Therefore, it is

ORDERED that the Plaintiffs' motion for a preliminary injunction (Doc. 5) is denied. It is further

ORDERED that the Defendant's motion for summary judgment (Doc. 20) is granted. It is further

ORDERED that judgment hereby enters for Defendant under Rules 56 and 58 of the Federal Rules of Civil Procedure.

Dated August 4, 2010.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE